*In re* M.P. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellant v. Michael Scott Putman, Respondent-Appellee).

Fifth District    No. 5—00—0091

Opinion filed September 14, 2001.

Robert B. Haida, State's Attorney, of Belleville (Norbert J. Goetten, Stephen E. Norris, and Sharon Shanahan, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Gregory M. Skinner, of Swansea, for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:

The State appeals from an order of the circuit court of St. Clair County denying its petition to terminate the parental rights of Michael Scott Putman (respondent), an inmate in the Illinois Department of Corrections, and to appoint a guardian for the minors M.P., L.P., and C.P. (minors). On appeal, the State contends that the trial court's determination that respondent was not an unfit parent was contrary to the manifest weight of the evidence and the legislative intent of subsection 1(D)(s) of the Adoption Act (750 ILCS 50/1(D)(s) (West 1998)). We reverse and remand.

## I. BACKGROUND

On June 19, 1995, the State filed a petition for adjudication of wardship, alleging that M.P., born on June 14, 1986, L.P., born on May 5, 1988, and C.P., born on December 27, 1989, along with their three half-siblings, were abused and neglected minors. The petition alleged, *inter alia*, physical and sexual abuse by the mother's paramour. At the

time the petition was filed, respondent was an inmate at the Big Muddy Correctional Center. On July 24, 1995, the minors were adjudicated abused and neglected. On October 16, 1995, the mother and her paramour admitted the allegations contained in the petition, and the minors were made wards of the court. Respondent was granted visitation with the minors once each month for a two-hour period. The Department of Children and Family Services (Department) was ordered to arrange visitation between respondent and the minors. The paternal grandfather was later granted monthly visitation with the minors.

On July 29, 1996, a service plan was filed with the court. The plan noted that respondent remained incarcerated and that monthly visitation had occurred between respondent and the minors. It further noted, "[Respondent] has shown an interest in his children by maintaining regular written contact," but it also stated, "[Respondent] has not complied with service plan tasks aimed at addressing his ability to parent the children or in addressing his history of alcohol abuse." A service plan filed on February 19, 1997, mentioned that respondent failed to comply with previous service-plan tasks aimed at addressing respondent's parenting ability and history of alcohol and drug abuse but that respondent maintained written contact and monthly visitation. It also noted that respondent had been transferred to Robinson Correctional Facility.

On July 3, 1997, respondent filed a petition for the custody of the minors. He alleged that, even though he was incarcerated, he would be able to provide for and take care of his children through adult relatives, including the paternal grandfather, who were willing to care for the minors until respondent was released from prison. On August 11, 1997, the guardianship administrator of the Department filed a motion to modify visitation with the minors due to the alleged sexual abuse of the minors by both respondent and the paternal grandfather. On November 24, 1997, the motion to modify visitation was denied, and monthly visitation was ordered to continue.

On February 4, 1998, a case summary was filed, which noted that respondent remained incarcerated in the Centralia Correctional Center and that no documentation had been received regarding respondent's participation in any services, such as parenting classes. The next service plan was filed with the court on June 8, 1998, and noted that respondent needed to deal with his indicated report of sexual abuse by completing a sexual-perpetrator evaluation. The report also noted that respondent was transferred to Stateville Correctional Center (Stateville) in Joliet, requiring the minors to travel $5^{1}/_{2}$ to 6 hours one way in order to visit with respondent.

On November 13, 1998, per the trial court's instructions, a Department caseworker filed a case summary. The caseworker reported that respondent was released from Stateville on July 24, 1998. However, the caseworker also reported that respondent was arrested just three days later, July 27, 1998, for aggravated fleeing of a police officer. The caseworker noted that respondent was awaiting the possible revocation of his parole.

On August 31, 1999, a motion to terminate respondent's parental rights was filed. The State alleged that respondent failed to maintain a reasonable degree of interest, concern, or responsibility for the minors and that respondent's repeated incarcerations prevented him from discharging his parental responsibilities. The motion set forth the following five convictions and incarcerations: (1) January 16, 1992—respondent pleaded guilty to the amended charge of theft over $300 (Ill. Rev. Stat. 1991, ch. 38, par. 16—1 (now 720 ILCS 5/16—1 (West 1998))) and was sentenced to two years of probation; (2) July 28, 1992—respondent was convicted of forgery (Ill. Rev. Stat. 1991, ch. 38, par. 17—3(a)(2) (now 720 ILCS 5/17—3(a)(2) (West 1998))) and was sentenced to two years in prison; (3) August 6, 1992—respondent's probation was revoked, and he was sentenced to three years in prison to run concurrently with a previous three-year prison sentence; (4) September 1, 1994—respondent was convicted of unlawful possession of a stolen motor vehicle (625 ILCS 5/4—103(a) (West 1992)) and theft over $300 (720 ILCS 5/16—1(a)(1)(A) (West 1992)) and was sentenced to nine years in prison; and (5) January 28, 1999—respondent was convicted of aggravated fleeing (625 ILCS 5/11—204.1(a)(1) (West 1998)) and was sentenced to 2½ years in prison.

On January 10, 2000, the trial court conducted a hearing on the motion to terminate respondent's parental rights. The State presented one witness, Pamela Fraley, the Department caseworker in charge of the minors' case. Fraley recounted that the minors were under the Department's care since June 1995 and that respondent remained incarcerated virtually the entire time. Respondent was released from prison on July 24, 1998, only to be rearrested on July 27, 1998, on new charges. Respondent did not try to contact the minors during the three-day period that he was out of jail. Fraley testified that respondent was unable to provide for his children while he was incarcerated. She believed that it was time for the minors to have an opportunity for a permanent living situation. Fraley testified that respondent needed to complete a sexual-perpetrator evaluation, parenting classes, and an alcohol evaluation, as well as any treatment necessary to fulfill his service plan.

On cross-examination, Fraley agreed that the Department's origi-

nal involvement in the case had nothing to do with respondent but was precipitated by sexual-abuse allegations against the mother's paramour. According to Fraley, the paramour signed surrender papers for all his children, and the mother was willing to surrender her rights to the minors in question. While Fraley did not believe that respondent completed any of the tasks required by his service plan, she admitted that she did not check with the prison to find out whether a sexual-abuse evaluation had been completed or whether respondent completed any parenting or alcohol-treatment classes. Fraley further admitted that respondent participated in his monthly visits with the minors, sent numerous letters to the minors, and sent several letters to Fraley inquiring about the minors' welfare; nevertheless, Fraley believed that respondent failed to maintain a reasonable degree of interest, care, or concern for the minors and had been unable to provide for them due to his incarceration. Fraley pointed out that because respondent was incarcerated, he was unable to provide a home for the minors, was unable to attend to their day-to-day physical needs, and was unable to participate in their education.

Fraley agreed that respondent demonstrated concern for the girls. She noted that if respondent was able to get out of prison and stay out, the Department would get a better idea as to whether or not he could support his children. However, she also noted that while respondent expresses concern for the minors, the Department is concerned about respondent's ability to follow through. She reported that most of the incarcerated parents she supervises do write to their children and show an interest in them. According to Fraley, the minors visit with respondent as regularly as possible, but sometimes the minors do not want to travel the requisite number of hours to visit with respondent.

After Fraley testified, the State submitted certified copies of respondent's five convictions and resulting incarcerations, which we outlined above. The State rested. Respondent then testified on his own behalf.

Respondent testified that from 1986 to 1992 he took care of his children and that the Department was not involved; however, he admitted that since 1992 he was almost always in prison. According to respondent, the Department provided him with an initial service plan but had not provided him with another plan since 1997. Respondent testified that he completed parenting classes, and he produced a certificate of completion for one such class. Respondent received his general equivalency diploma (GED) and provided the court with a copy. Respondent claimed that he also participated in a drug-and-alcohol-treatment program and underwent a sexual-offender evaluation, but

he failed to provide any documentation supporting these claims. Respondent further claimed that the evaluator did not recommend any treatment. Respondent believed that he would be released in early May 2000 and wanted to be reunified with the minors upon his release. He was adamant that he would be able to provide for his children. He told the court that if for some reason he was not able to provide for them, he would sign surrenders for the minors and allow them to be adopted. Respondent claimed that the letter accusing him of sexual abuse, allegedly written by his daughter, was actually written by an adult. Respondent also claimed that he was innocent of the charge for which he was incarcerated in 1994, and he claimed that he fled from the police in July 1998 because a friend brought a stolen gun into the car.

After hearing all the evidence, the trial court found that respondent was not an unfit parent, and the court denied the State's motion to terminate respondent's parental rights. The trial court found this case to be "unique," noting that respondent had completed parenting classes, obtained his GED, received alcohol treatment, was neither violent nor abusive toward the minors, and provided for the minors prior to his incarceration. The trial court pointed out that the incidents which precipitated the Department's involvement had nothing to do with respondent. The trial court concluded, "[G]iven the fact that his out-date is only a few months from now, although the basic facts fit into the statute, I am not satisfied that I can find by clear and convincing evidence that [respondent] is unfit." The State now appeals from this ruling.

## II. ANALYSIS

The State contends that the trial court's determination that respondent was not unfit, despite its conclusion that the facts of this case fit into the legislative mandate of subsection 1(D)(s) of the Adoption Act regarding repeated incarcerations, was contrary to the manifest weight of the evidence. We agree.

●1 The termination of parental rights is an extraordinary measure, given the superior right of parents, against all others, to raise their children. See *In re Adoption of Syck*, 138 Ill. 2d 255, 274-75, 562 N.E.2d 174, 184 (1990). Therefore, the repeal of a parent's right to raise his or her child may not occur in the absence of clear and convincing evidence of a parent's unfitness, which must be determined *prior* to a consideration of the child's best interest. *Syck*, 138 Ill. 2d at 275-76, 562 N.E.2d at 184. The *Syck* court stated:

"When ruling on parental unfitness, a court is not to consider the child's 'best interests.' [Citation.] '[W]here the rights and

interests of a parent are sought to be permanently severed, the best interests of the child can be considered only if the court finds by clear and convincing evidence that the parent is unfit or consents to the severance [citations].' [Citation.] Only evidence that bears on the issue of unfitness is to be considered, precluding evidence bearing on the child's 'best interests' (see [*In re Adoption of*] *Burton*, 43 Ill. App. 3d [294,] 299-302[, 356 N.E.2d 1279 (1976)] (Adoption Act indicates legislature's intent that 'a finding of parental unfitness necessarily precede consideration of the best interests of the child'; there is a two-step process of first ruling on parental unfitness and then, if called for, ruling on whether adoption is in child's best interests \*\*\*))." *Syck*, 138 Ill. 2d at 276, 562 N.E.2d at 183-84.

A reviewing court will not disturb the trial court's fitness finding unless it is against the manifest weight of the evidence; the record must clearly demonstrate that the result opposite to the one reached by the trial court was the proper result. *In re T.B.*, 215 Ill. App. 3d 1059, 1062, 574 N.E.2d 893, 896 (1991).

•2 The Adoption Act defines an unfit person:

"[A]ny person whom the court shall find to be unfit to have a child, *without regard to the likelihood that the child will be placed for adoption*. The grounds of unfitness are any one or more of the following:

\* \* \*

(s) The child is in the temporary custody or guardianship of the Department of Children and Family Services, the parent is incarcerated at the time the petition or motion for termination of parental rights is filed, the parent has been repeatedly incarcerated as a result of criminal convictions, and the parent's repeated incarceration has prevented the parent from discharging his or her parental responsibilities for the child." (Emphasis added.) 750 ILCS 50/1(D)(s) (West 1998).

The ground of a parent's repeated conviction and incarceration was added only recently to the definition of "unfit person" in section 1(D) of the Adoption Act. Pub. Act 90—28, eff. January 1, 1998 (1997 Ill. Laws 1582-83).

•3 In the instant case, the State submitted certified copies of respondent's five prior felonies. Respondent agreed that he had been incarcerated since 1992, except for a three-day period in July 1998. Respondent was released from prison on July 24, 1998, after completing his sentences for possession of a stolen motor vehicle and theft over $300, only to be arrested on July 27, 1998, on a new charge of aggravated fleeing. He was later convicted of that offense and was sentenced to 2¹/₂ years in prison. It is interesting to note that, during

that three-day period of freedom, respondent failed to visit or contact his children. We find that the State proved that respondent was unfit within the meaning of section 1(D)(s) of the Adoption Act (750 ILCS 50/1(D)(s) (West 1998)) by showing that the minors were in the temporary custody and guardianship of the Department, that respondent was incarcerated at the time the petition for termination of parental rights was filed, and that respondent's repeated incarcerations prevented him from discharging his parental responsibilities for the minors.

In *In re M.M.J.*, 313 Ill. App. 3d 352, 355, 728 N.E.2d 1237, 1240 (2000), our colleagues in the Fourth District recognized that a parent who is repeatedly incarcerated cannot be an effective parent and should be found unfit pursuant to subsection 1(D)(s) of the Adoption Act. The *M.M.J.* court stated in pertinent part as follows:

> "Being a parent involves more than attending a few visits and sending an occasional gift to the child. The child needs a positive, caring role model present in her life. This ground for unfitness [(repeated incarcerations)] may be utilized regardless of respondent father's efforts, compliance with DCFS tasks and satisfactory attainment of goals, or the amount of interest he has shown in his daughter's welfare. Here, respondent father's repeated incarcerations have prevented him from providing the emotional and financial support and stability M.M.J. needs and deserves. Moreover, his past criminal history raises the inference that respondent father will continue to be unavailable and inadequate as a parent."

*In re M.M.J.*, 313 Ill. App. 3d at 355, 728 N.E.2d at 1240. In that case, after the father was determined to be unfit, a second finding was made that the termination of the father's parental rights was in the best interest of M.M.J. *In re M.M.J.*, 313 Ill. App. 3d at 356, 728 N.E.2d at 1240.

In the instant case, the plain meaning of subsection 1(D)(s) of the Adoption Act required finding the respondent unfit. There was no question that respondent had been repeatedly incarcerated as a result of criminal convictions and was not an effective parent. We agree with the State that repeated incarceration alone is enough for an indication of unfitness pursuant to subsection 1(D)(s) of the Adoption Act. Courts must not allow children to live indefinitely with the lack of permanence inherent in foster homes. *In re A.H.*, 215 Ill. App. 3d 522, 530, 575 N.E.2d 261, 267 (1991). Here, there is no question but that respondent's repeated incarcerations have prevented him from providing the minors with the necessary emotional and financial support and stability required of a parent. The State proved by clear and convincing evidence that respondent was unfit due to his repeated incarcerations.

Accordingly, the trial court's decision that respondent was not unfit for purposes of subsection 1(D)(s) of the Adoption Act is against the manifest weight of the evidence.

After reviewing the record before us, we conclude the trial court was required to apply the two-step process by which a court must (1) consider the parent's fitness and (2) consider the minors' best interests. Instead, the trial court commingled the evidence of the father's unfitness and the minors' best interests. See *In re V.S.*, 285 Ill. App. 3d 372, 674 N.E.2d 437 (1996). The trial court itself acknowledged that the facts of this case fit the legislative intent of the Adoption Act. Respondent's efforts to take control of his life, such as completing his GED and attending parenting and alcohol-treatment classes, and efforts to assert parental responsibility, such as his writing to the minors and making repeated inquiries to the Department about the minors' welfare, were not relevant in considering respondent's fitness. Respondent's efforts would only be relevant at the termination stage, when the trial court is required to consider the minors' best interests. Respondent's efforts were inappropriately considered at the fitness stage.

## III. CONCLUSION

Accordingly, we reverse the trial court's finding of fitness and remand for further proceedings, specifically, a separate finding concerning the minors' best interests and whether or not the termination of respondent's parental rights would be in the minors' best interests. We note that respondent should have been released from prison by this time. It will be important to find out whether respondent has been able to stay out of jail longer than three days. More importantly, the trial court must determine whether respondent has been able to provide the minors with the emotional and financial support that he promised and they deserve.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is reversed, and this cause is remanded for proceedings consistent with this opinion.

Reversed; cause remanded.

MAAG, P.J., and KUEHN, J., concur.